UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,
                Plaintiff,

       v.                                          Case No. 09-CR-83

RONALD JOHNSON,
                Defendant.

## RECOMMENDATION THAT JOHNSON'S MOTION TO SUPPRESS BE DENIED

**PROCEDURAL HISTORY**

On March 24, 2009, the grand jury returned a three count indictment alleging that Ronald Johnson ("Johnson") possessed with intent to distribute more than 50 grams of crack cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A), (Count 1), possessed with intent to distribute MDMA, in violation of Title 21, United States Code 841(a)(1) and 841(b)(1)(C), (Count 2), and possessed a firearm after having been convicted of a felony, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2), (Count 3). (Docket No. 1.) Following Johnson's arraignment, this court entered a pretrial order establishing April 29, 2009 as the deadline for the filing of pretrial motions. (Docket No. 7.)

On April 29, 2009, Johnson filed a motion for an extension of time to file pretrial motions. The court found that the reason provided by Johnson's attorney, that Johnson was held about two-hours away, insufficient cause to warrant the full extension requested. (Docket No. 9.) Therefore, the court granted Johnson a one-week extension to May 6, 2009, and instructed Johnson's attorney to make arrangements to visit his client. (Docket No. 10.)

On May 6, 2009, Johnson filed a motion to suppress, (Docket No. 12,) and on the following day, a brief in support of the motion was filed. (Docket No. 13.) Both the motion and brief contained a signature line for Johnson's attorney, which were unsigned. Based upon the introductory paragraph of the supporting brief, and despite this court's prior instructions, it appears that Johnson's attorney had still failed to meet with his client. More importantly, Johnson failed to provide the court with any factual basis to conclude that suppression was appropriate.

Consequently, the court recommended that Johnson's motion to suppress be denied. (Docket No. 14.) As stated in the recommendation, the court found that the incomplete motion could not sustain the relief requested.

On May 22, 2009, in response to a motion filed by Johnson, the Honorable J.P. Stadtmueller noted that "[i]n light of the[] regrettable circumstances" cited by Johnson's attorney, he recommitted the defendant's motion to this court. (Docket No. 17.) However, this court was not informed of Judge Stadtmueller's action and so the matter sat idle for more than a month.

On June 29, 2009, immediately after this court became aware of Judge Stadtmueller's action, this court ordered Johnson to submit a proper and complete motion to suppress. The court also provided the government the opportunity to respond to any request for an evidentiary hearing and gave the defendant the opportunity to reply. (Docket No. 18.)

On July 13, 2009, Johnson filed a motion to suppress, still unsigned, but the motion presented a factual and legal basis for suppression. (Docket No. 19). On July 23, 2009, the government responded, agreeing that an evidentiary hearing was necessary, (Docket No. 20). The court, therefore, granted Johnson's request for an evidentiary hearing. (Docket No. 21.)

On August 25, 2009, Judge Stadtmueller recused himself from all further proceedings in this case, citing 28 U.S.C. § 455(a) and (b)(3). Therefore, this matter was reassigned to the Honorable Rudolph T. Randa. (Docket No. 24.)

2

On September 2, 2009, an evidentiary hearing was held before this court. A summary of the evidence adduced at this hearing is set forth below. At the conclusion of the hearing, the court established a briefing schedule. The defendant failed to file his post-hearing brief on September 18, 2009, as required. Not wanting to foreclose a response from the defendant, the court, sua sponte, modified its briefing schedule, giving the defendant until September 25, 2009 to submit a brief, providing the government the opportunity to respond.

On September 25, 2009, the defendant filed three pages in support of his motion to suppress. Even though the memorandum contains no date or signature portion, it appears that this is the complete memorandum and the court will proceed on that basis. The government has chosen not to file a response. The pleadings on the defendant's motion to suppress, (Docket No. 19), are now closed and the matter is ready for resolution.

**EVIDENTIARY HEARING SUMMARY**

**Milwaukee Police Officer Todd Bohlen**

Milwaukee Police Officer Todd Bohlen ("Bohlen") is assigned to the Neighborhood Task Force, a unit that focuses upon high crime areas. As part of his duties and as a result of his prior assignments, Bohlen concentrates on investigations regarding drugs and gangs.

In the months prior to the execution of the search warrant, Bohlen learned from a confidential informant ("CI") that an individual known as "Loc" was selling significant quantities of cocaine from a residence in the Hillside Terrace housing project. The CI identified the specific apartment Loc was selling cocaine from, described the interior of the residence, provided descriptions of the vehicles that Loc was known to drive, and provided information as to Loc's criminal history, i.e. that he had been "in the joint." The CI stated that Loc lived in the target residence with his girlfriend and a young child. The CI also provided a physical description of Loc

and stated that Loc regularly carried a handgun. The CI demonstrated to Bohlen that he was familiar with firearms, and the CI provided details as to the firearm Loc was known to carry.

In the two months between the CI's tip and the execution of the search warrant, Bohlen conducted extensive surveillance of the target residence. At one point during this surveillance the CI was with Bohlen outside the target residence, and the CI observed an individual exit the target residence. The CI identified this person for Bohlen as Loc. Bohlen repeatedly observed Loc drive the vehicles that the CI stated he drove. This CI had been proven reliable in the past; the CI provided information that led to five prior successful search warrants and provided information about other crimes that the police were able to corroborate. Bohlen learned that the residence was leased to a female; after Johnson's arrest, this female was determined to be Johnson's fiancée.

Within the 72 hours prior to Bohlen applying for the search warrant, the CI reported seeing numerous ounces of cocaine on the kitchen table within the target residence, and Loc was selling cocaine to numerous individuals. Also, within 7 days of when Bohlen applied for the search warrant, the CI saw a firearm within the residence. On January 27, 2009, Bohlen applied for and received a state court "no knock" search warrant for the target residence. (Docket No. 20-2.)

On the morning of January 29, 2009, Bohlen was conducting surveillance on the target residence when he saw Loc come around the side of the building and get into one of the vehicles he and the CI identified Loc as operating. Loc drove from the scene and Bohlen followed him. A few blocks away, Bohlen initiated a traffic stop of Loc's vehicle. However, Bohlen did not observe any traffic violation. Bohlen stopped Loc's vehicle based upon the probable cause set forth in the search warrant affidavit and so that Loc would be secured away from the residence while the Tactical Enforcement Unit entered the residence to execute the search warrant.

Bohlen contacted Loc in a manner intended to lead Loc to believe that it was just any other traffic stop. Bohlen asked Loc for his driver's license and Loc provided Bohlen a driver's license in

4

the name of Joshua McGee. Bohlen testified that he believed that this driver's license was fake. Bohlen asked him where he lived and Loc indicated towards the Hillside Terrace housing project and gave the target address. Bohlen said that Loc looked familiar and asked him what people called him. Loc responded that people call him "Loc." Because the CI had said that Loc had tattoos, Bohlen asked Loc if he had any tattoos. Loc responded that he had "Loc" on his arm and "Ron Loc" on his chest.

Bohlen asked Loc to step out of the vehicle and proceeded to pat him down. Because the CI reported that Loc regularly carried a firearm, Bohlen was concerned that he may be armed. As he patted Loc down, he asked Loc if he had anything that Bohlen should be concerned about. Loc responded that he had some marijuana in his shoe. Bohlen then placed Loc in handcuffs and escorted him back to his squad car. He had Loc sit in the back of the squad car with his feet outside of the car and took off Loc's shoe. From Loc's shoe, Bohlen recovered a small amount of marijuana.

At some point during this encounter,r the units assigned to execute the search warrant came to the scene of the traffic stop, and Bohlen told the units to execute the search warrant. Bohlen called for a police wagon, and about half-an-hour later Loc was transported to his residence where the execution of the warrant was already underway.

At the residence, Bohlen opened the back of the wagon and read the face of the search warrant to Loc. After he finished, without any further solicitation from Bohlen, Loc stated something to the effect of, "Everything in the apartment is mine." Bohlen and Loc then proceeded to talk about what Loc had in the apartment but Bohlen does not recall any specifics of this conversation. At one point, Bohlen also asked Loc for the combination for a safe. Loc did not answer Bohlen but instead "hemmed and hawed."

5

Loc was eventually transported to the Milwaukee Police Administration Building and Loc was identified through fingerprints as the defendant, Ronald Johnson. The driver's license that Johnson provided was fraudulent because, although it contained Johnson's photograph, it contained the name of Johnson's brother. Johnson was subsequently interviewed by Milwaukee Police Officer Andrew Bell ("Bell"). This interview was recorded, and a CD of this interview was received as Exhibit 1. Bohlen was present for much of the interview. Bohlen did not transport Johnson to the interview room and at no point did he ever make any comment indicating that the person on the lease might be charged if Johnson did not acknowledge that the contraband in the apartment was his.

**Milwaukee Police Officer Andrew Bell**

Bell was not involved in the investigation into Johnson until he was asked to conduct the interview of Johnson. The interview was conducted in a roughly 5' x 10' office in the Police Administration Building that contained a desk, a chair, and a wooden bench. The interview began at 5:26 P.M. and lasted roughly 40 minutes. Bohlen was present for the majority of the interview.

The recording begins outside the interview room where Bell provides the date, time, and location, and then he is heard entering the interview room, introducing himself to Johnson, and asking if there is anything he can get for him. Johnson requests water and cigarettes. The recording continues as Bell goes out of the interview room, meets with Bohlen, and gives Bohlen a dollar for a bottle of water. Bell returns to the interview room and takes the handcuffs off of Johnson.

Johnson asks to use the phone and Bell says that he will be able to in a little while. Bell then proceeds to go over certain background information such as details about Johnson's family, education, and his personal, medical, gang, and criminal histories. In the midst of this personal background information another voice is heard on the tape for the first time, apparently that of Bohlen.

6

About seventeen minutes into the recording, Bell asks Johnson if he has ever been read his rights. After Johnson says that he has never been read his rights before but that he knows that he has "the right to remain silent and all that type of stuff," Bell proceeds to read the rights exactly as they are set forth on the front side of Exhibit 4. Bell then asks Johnson if he understands his rights, to which Johnson replies, "Yes." Bell then asks Johnson if he understands that this is his opportunity to tell him what happened today. Johnson again says, "Yes," and Bell asks, "Are you willing to do that?" Johnson says, "Yes."

Bell then proceeds to begin to ask Bell how he started his day and Johnson proceeds to describe the routine and mundane things he did that morning. At one point, after Bell sounds surprised when Johnson says that he had a valid license, Johnson laughs when saying that he did have a valid license; it was just under his brother's name. When Johnson is asked what was in his residence, Johnson readily admits that he had seven ounces of crack cocaine on a shelf in a bedroom closet, a scale, and a gun and money in the safe.

Johnson is asked to estimate how much cocaine he might have sold during his time in Milwaukee, and after saying he "went through a lot," Johnson asks where the questions are leading. One of the two officers heard on the tape states that he needs to know that Johnson is being honest. Johnson replies that he is and states he has no reason to be untruthful. Johnson then estimates that in the past two years he has sold between ten to fifteen kilograms of cocaine. There is then a discussion about the price that Johnson has paid for this cocaine and where he got it from.

After this discussion, Johnson appears to become emotional and mentions his children. The conversation turns to the firearm and Johnson states that he got the gun from someone he knows as "Rock" because he owed Johnson money, and he had it because he was shot at about two weeks earlier. Johnson then states, "You got me good. . . . I can be a man and admit that. . . . There's nothing I can do."

After some more discussion, Bell says to Johnson that they are going to step out for a minute, but before they do he asks Bell if he needs anything else. They are heard providing Johnson with a phone and then Bell states that the interview ended at 6:03 P.M.

The tone of the entire interview is friendly and cordial. At no point are any threats made nor are voices even raised. Johnson demonstrates little reluctance answering every question posed to him.

**Ronald Johnson**

Johnson testified that after he was placed in the police wagon and brought back to his residence, Bohlen opened the back door of the wagon and read the warrant to him. Bohlen then asked, "Is there anything you want to talk to me about?" Johnson responded that he did not know what Bohlen was talking about. Bohlen replied that if they find something in the residence they can arrest him and whoever is on the lease. To this, Johnson responded, "If you find anything, it is mine."

Later, Bohlen came back to the wagon and asked for the combination to the safe that was found in the residence. Johnson responded that he did not know because it was his fiancée's safe. This was a lie.

That evening, Johnson was interviewed at the Police Administration Building. Prior to the interview, as Bohlen was transporting Johnson to the interview room, Bohlen made comments to the effect that Johnson should cooperate because if he did not, the feds might take the case, that the person on the lease could be charged and if she was charged, she would be kicked out of the housing project, and stated that the daughter of Johnson's fiancée would be go into state custody if Johnson's fiancée was charged.

Bell then entered the interview room and asked if he wanted anything, at which point Bohlen left. Bell went over some background questions and then went over his <u>Miranda</u> rights.

8

Johnson understood his rights and agreed to waive them. At no point during the interview were any threats made to him. However, Johnson was concerned that his fiancée, who was pregnant, would be charged if he did not talk, so he talked. During the interview Johnson was again asked for the combination to the safe, which he provided, and thus, during his testimony, he acknowledged that he lied at the scene when he said he did not know the combination of the safe and that it was his fiancée's. He lied because he did not want the officers to go into the safe.

**ANALYSIS**

The defendant initially challenged his arrest and his statements. In his post-hearing memorandum, Johnson has abandoned any challenge to his arrest and seeks to suppress only his statements on the basis that they were obtained in violation of his Miranda rights. The entire substantive portion of his memorandum in support of his motion to suppress is as follows:

> As to the first statement, which were [sic] made at the scene of the initial stop, the testimony of the Officer Bohlen established that Mr. Johnson was under arrest, that he was interrogated in connection with a drug investigation, and that he was not advised of his Miranda rights.
> As to the second statement, which was made at the search warrant location, the testimony of Officer Bohlen established that Mr. Johnson was under arrest and that he not advised of his Miranda rights. Although Officer Bohlen did not admit that he interrogated Mr. Johnson at that time, the totality of the evidence establishes that Mr. Johnson made an incriminating statement either in response to a direct question or in response to police actions that were the functional equivalent of questioning.
> As to the third statement, which was made at the police station, the testimony of Officers Bohlen and Bell established that Mr. Johnson was still under arrest and that he was subjected to direct interrogation. The testimony of Officer Bell and the audio recording of Officer Bell's interview of Mr. Johnson establish that Officer Bell did not ask Mr. Johnson if he was willing to waive his Miranda rights. Further, the totality of the evidence establishes that this third statement was obtained by exploiting the Miranda violations that the police used to obtain the first two statements.

(Docket No. 30 at 2-3.)

In order for a suspect to be entitled to the protections afforded under Miranda, the suspect must be in custody and subject to interrogation. United States v. Yusuff, 96 F.3d 982, 987 (7th Cir. 1996) (citation omitted).

Initially Johnson did not challenge his first statement, i.e. the one made on the scene of the traffic stop. (See Docket No. 19 at 7.) Now in his brief post-hearing memorandum he suggests that this statement was also obtained in violation of his Miranda rights.

Johnson acknowledges that Bohlen possessed probable cause to arrest him at the time his vehicle was stopped. (Docket No. 30 at 2.) Further, Bohlen testified that once Johnson was stopped, Johnson was not free to drive away, and it was Bohlen's intention to take Johnson into custody. (Docket No. 28 at 39.) But Bohlen's subjective intent is not the critical question when it comes to determining whether a person is in custody for Miranda purposes. Because the Court's aim in Miranda was to counteract the inherently coercive nature of custodial interrogation, the crucial question is whether, based upon the totality of the circumstances, a reasonable person in the suspect's position would believe that he was in custody. See, e.g., United States v. Fazio, 914 F.2d 950, 954 (7th Cir.1990); United States v. Wyatt, 179 F.3d 532, 535 (7th Cir. 1999). If the subject is not aware he is in custody, there is no threat of coercion.

The evidence at the evidentiary hearing demonstrates that from Johnson's perspective, he was detained pursuant to a routine traffic stop. Persons detained pursuant to traffic stops, like persons stopped pursuant to Terry stops, are not in custody for Miranda purposes. See Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984); see also United States v. Wyatt, 179 F.3d 532, 536 (7th Cir. 1999). It was not until Bohlen placed Johnson in handcuffs would a reasonable person believe that he was no longer detained pursuant to a traffic stop but was now under arrest. All relevant questioning preceded this event.

Additionally, Johnson was not subjected to interrogation. The testimony at the evidentiary hearing demonstrated that after Bohlen stopped Johnson's vehicle, Bohlen asked Johnson if he had a driver's license, what people know him as, where he lived, and when Johnson informed Bohlen that he was moving, Bohlen asked where he was moving to. These preliminary questions are clearly

not interrogation. See id. at 439 ("[T]he officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.").

Finally, while conducting a pat-down search, because Bohlen was aware that Johnson was known to carry a gun, Bohlen asked Johnson a question to the effect of, "Do you have anything on you you shouldn't have?" or "Hey, you got anything on you?" (Docket No. 28 at 22.) In the context of a frisk and under the circumstances presented in this case, such questions fall within the public safety exception to Miranda. See, e.g., United States v. Jones, 567 F.3d 712, 714 (D.C. Cir. 2009) (citing New York v. Quarles, 467 U.S. 649 (1984)). Therefore, at the scene of the traffic stop, there was no custodial interrogation, and thus Johnson was not entitled to his Miranda warnings.

Johnson's second statement, that "everything in the apartment is mine," was made while he was in the back of a police wagon and was transported back to his residence where the execution of the search warrant was already underway. The evidence clearly establishes that Johnson was in custody at this point. Thus, the critical question is whether Johnson was subjected to interrogation.

Bohlen contends that Johnson made this statement unsolicited after he finished reading him the warrant. On the other hand, Johnson contends that after Bohlen finished reading the warrant, Bohlen asked Johnson if there was anything illegal in the apartment. When Johnson responded that he did not know what Bohlen was talking about, Bohlen replied that if they did find anything, they would arrest the person whose name was on the lease and suggested that Johnson's girlfriend's daughter would be taken into state custody. Because of Bohlen's statements and not wanting his girlfriend to be arrested, Johnson made a statement to the effect of "if you find anything in the apartment, it's mine." (Docket No. 19.)

Thus, the court is faced with a preliminary question of credibility. Was the statement unsolicited or did Bohlen make further statements suggesting that Johnson's girlfriend would be

arrested and her daughter taken into state custody, before Johnson made the statement? Only if the court finds that Johnson made the statement in response to Bohlen's statements must the court consider whether Johnson was subjected to interrogation. Based upon his testimony at the evidentiary hearing and his obvious motive to be untruthful, the court finds that Johnson's testimony is not credible and thus concludes that Johnson's statement was spontaneous and unsolicited.

Spontaneously acknowledging ownership of everything in the house upon being read the search warrant is entirely consistent with the cooperative and forthright attitude that Bohlen and Bell testified Johnson exhibited and was recorded in Johnson's custodial interrogation. All of Johnson's conduct throughout his encounter with law enforcement that day was consistent with the realization reflected in his recorded statement: "You got me good. . . . I can be a man and admit that. . . . There's nothing I can do." Only now, after the potential consequences of his acknowledgments have become apparent has Johnson sought to find a way to backtrack.

Further, Johnson acknowledged that he lied when talking to the police regarding the ownership of the safe. Although it might be simple to conclude that this prior demonstrated willingness to lie renders Johnson's testimony incredible, it is not merely the lie itself but the nature of the lie that causes the court to conclude that Johnson's version of events is not credible.

Johnson would like the court to believe that only after he was faced with the threat of his pregnant girlfriend being charged did he acknowledge ownership of everything in the apartment. However, he acknowledges that only moments after this supposed exhibition of compelling concern for his girlfriend's wellbeing, he was willing to lie in an attempt to pin ownership of the inculpatory safe upon his girlfriend.

If Bohlen had actually threatened Johnson that his girlfriend would be arrested and it was because of this that Johnson acknowledged ownership of items in the house, the court finds it

entirely unlikely that moments later Johnson would then lie in an attempt to inculpate his girlfriend with ownership of the safe. However, a spontaneous and unsolicited acknowledgment is entirely consistent with the generally cooperative and forthright attitude that Johnson demonstrated throughout his encounter with the police that day and that is recorded in his subsequent custodial interrogation. Finally, notably absent from Johnson's recorded interrogation is any allusion to any prior threats that his girlfriend might be charged.

As for Johnson's third statement, the court finds no basis to recommend the suppression of this statement. First, as discussed above, the court finds there was no Miranda violation resulting from either of Johnson's prior statements and thus there was no Miranda violation for the police to exploit.

Second, although Bell did not read the precise phrase contained on Exhibit 4, Johnson provides absolutely no legal support for his apparent contention that this precise sentence must be read prior to interrogation. Absent any legal support to the contrary, the court finds no impropriety Bell asking Johnson if he understands that this is his opportunity to tell him what happened today and then asking Johnson if he is willing to do so. Johnson answered both questions in the affirmative and the interrogation proceeded. The recording makes clear that Johnson was advised of his Miranda rights and chose to waive them and make a statement.

**IT IS THEREFORE RECOMMENDED** that Johnson's motion to suppress, (Docket No. 19), be **denied**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any

objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 6th day of October 2009.

s/AARON E. GOODSTEIN<br>
U.S. Magistrate Judge